UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

vs.                                                   Case No. 8:14-cr-521-T-27AEP

EDWARD NEIL FELDMAN
and KIM XUAN FELDMAN
_____/

## ORDER

**BEFORE THE COURT** is Defendant Edward Neil Feldman's Renewed Motion for

Judgment of Acquittal or, in the Alternative, Motion for New Trial (Dkt. 295), and the Government's

opposition (Dkt. 303). Upon consideration, Defendant's motion is DENIED.[1]

After the Government rested its case in chief, Defendant moved under Fed. R. Cr. P. 29 for

judgment of acquittal on all counts and renewed his motion at the conclusion of trial. His motions

were denied, as I found the evidence was sufficient for a reasonable jury to find Defendant guilty

beyond a reasonable doubt. The jury returned guilty verdicts on all counts.[2]

### Rule 29 Motion for Judgment of Acquittal

While a "judgment of acquittal of any offense for which the evidence is insufficient to sustain

a conviction" may be granted under Rule 29(a), *United States v. Williams*, 291 Fed. App'x 288, 289

(11th Cir. 2008), a conviction will be upheld if "*any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." *United States v. Hunt,* 187 F.3d 1269,

---

[1] To the extent Defendant adopts the arguments made by Kim Feldman her motion, those arguments are rejected and the motion is denied, for the reasons discussed in the Order denying Kim Feldman's motion.

[2] Defendant was charged in Count One with conspiracy to distribute and dispense controlled substances, in Counts Two, Three and Four with knowingly and intentionally distributing or dispensing controlled substances not for a legitimate purpose and not in the usual course of professional practice, and resulting in the deaths of three individuals, in Count Five with conspiracy to engage in financial transactions involving proceeds from a specified unlawful activity, that is, conspiracy to distribute and dispense controlled substances, and in Counts Six, Seven and Eight with engaging in monetary transactions with proceeds derived from specified unlawful activity, that is, conspiracy to distribute and dispense controlled substances.

1270 (11th Cir. 1999) (emphasis in original). The evidence is viewed in the light most favorable to the Government and all reasonable inferences and credibility choices are drawn in favor of the jury's verdict. *United States v. Vernon*, 723 F.3d 1234, 1266 (11th Cir. 2013). If a reasonable jury could have found Defendant guilty beyond a reasonable doubt, the jury's verdict will stand. *United States v. McGuire*, 706 F.3d 1333, 1336 (11th Cir. 2013). I find that to be the case and therefore deny Defendant's renewed Rule 29 motion.

## Discussion

Defendant maintains there was insufficient evidence "to establish the existence of a conspiracy among the defendants" as charged in Count One. Specifically, he argues that the evidence was insufficient to "establish that [he] issued any prescription for other than a legitimate medical purpose in the usual course of professional practice." For the same reasons his Rule 29 motion was denied, his renewed Rule 29 motion is denied. Contrary to Defendant's contention, a reasonable jury could find beyond a reasonable doubt that Defendant knowingly participated in the conspiracy charged in Count One and that he prescribed the controlled substances alleged in Count One for other than a legitimate medical purpose and not in the usual course of professional practice.[3]

The Government's evidence was substantial, as accurately summarized by the Government in its response to Defendant's motion (Dkt. 303, p. 6 - 13). The Government presented expert testimony from Dr. Kevin Chaitoff, a pain management physician who reviewed many of Dr.

---

[3] That the Government's case may have relied on circumstantial evidence, as Defendant contends, does not render the evidence any less sufficient. In proving a conspiracy, "it is frequently necessary to resort to circumstantial evidence to prove its elements." *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998); *United States v. Gold*, 743 F.2d 800, 824 (11th Cir. 1984) ("The very nature of a conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.").

Feldman's patient files. Undercover agents who presented as patients to Dr. Feldman testified, as did several of Dr. Feldman's actual patients, each of whom explained the circumstances under which he prescribed controlled substances to them. This testimony demonstrated that he regularly prescribed controlled substances for other than legitimate medical purposes and not in the usual course of professional practice.

For example, patients were prescribed medications notwithstanding dirty urine screens indicating diversion or use of illegal drugs. In many instances, Dr. Feldman's patient histories were incomplete or inadequate, notwithstanding signs of potential abuse such as prescription profiles indicating doctor shopping and residences at great distances from his clinic. And there was evidence that Dr. Feldman prescribed excessive quantities of controlled substances or controlled substances in combinations that could be potentially dangerous, without any documentation that the patients had been advised of those risks. Inadequate or lack of physical examinations were noted, as was a lack of monitoring of patients who exhibited signs of potential abuse.

Dr. Chaitoff's review of Terry Dawson's patient file is illustrative of the evidence demonstrating that Dr. Feldman prescribed controlled substances for other than legitimate medical purposes and not in the usual course of professional practice. After her visit with Dr. Feldman, she was treated at Bayview Center for substance abuse. Correspondence confirming that treatment and that she was receiving methadone for her opiate addiction was forwarded to Dr. Feldman. Notwithstanding, he continued to prescribe controlled substances in increasingly large quantities to her, never noting Bayview's correspondence or documenting the medical justification for the increases. And Dr. Feldman continued to treat Dawson, notwithstanding that her file reflected that she had obtained various prescriptions from multiple doctors, suggestive of of doctor shopping.

3

Tellingly, undercover agent Joseph Pittaluga's testimony, the audio recording of which was presented to the jury, described his visit with Dr. Feldman and demonstrated another example of prescribing controlled substances for other than legitimate medical purposes and not in the usual course of professional practice. Pittaluga testified that Dr. Feldman discussed the drug epidemic in Florida and told him his condition did not require controlled substances. Notwithstanding, after Pittaluga told him he had taken some of his girlfriend's oxycodone and requested a prescription, Dr. Feldman told him he didn't want to know about that and then prescribed oxycodone to Pittaluga.

And the evidence was sufficient to prove beyond a reasonable doubt that Defendant conspired with his wife, Kim, as charged in Count One. Relevant to knowledge and intent, both expressed concerns about the presence of law enforcement at the clinic, parked in the rear of the clinic to avoid the officers, and instructed staff to watch for undercover officers and to place sticky notes on the file of any patient they suspected of being an undercover officer. Undercover agent Kissel's chart contained such a sticky note ("possible agent, review chart, keep meds low"). And if Dr. Feldman suspected that a patient was an officer, he took care in conducting a thorough physical examination and testing, and prescribed non-controlled substances. Staff accounts of this were corroborated by undercover officer Savoy.

Aimee Martin described her conversation with Dr. and Mrs. Feldman on how to stay under the radar of the DEA. Former employee Detwiller described Mrs. Feldman as being so concerned her husband would be arrested that she began placing assets in her name. And testimony described Dr. Feldman's recruitment of Ms. Martin to take over his practice in the event something happened to him, giving rise to an inference that he knew he was prescribing illegally. As the Government accurately describes in its opposition, there was additional evidence demonstrating Kim Feldman's

knowledge of Dr. Feldman's illegal prescribing and her actions in furtherance of the conspiracy charged in Count One. (Dkt. 303, p. 18).

In sum, the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Dr. Feldman prescribed controlled substances for other than legitimate medical purposes and not in the usual course of professional practice. The evidence was sufficient to show an agreement between Dr. and Mrs. Feldman to distribute controlled substances for other than legitimate medical purposes and not in the usual course of professional practice. *See United States v. Parrado*, 911 F.2d 1567, 1570 (11th Cir. 1990).

Count Five alleged a conspiracy to engage in financial transactions involving proceeds from a specified unlawful activity, that is, a conspiracy to distribute and dispense controlled substances, the conduct underlying the conspiracy charged in Count One. For the reasons discussed, the evidence supporting Count Five was likewise sufficient.[4]

Next, Defendant argues that the evidence was insufficient to support his convictions on Counts Six, Seven and Eight. He contends that a reasonable juror could not conclude that he distributed or dispensed the substances specified in the indictment for other than legitimate purposes and not in the usual course of professional practice. He contends that the Government's case was one of medical malpractice, not intentional misconduct. I disagree, for the reasons discussed.

Counts Six, Seven and Eight charged substantive monetary transactions with proceeds derived from specified unlawful activity. Since the evidence demonstrated beyond a reasonable doubt that Defendant was a knowing participant in the conspiracy charged in Count One, it follows

---

[4] As I read the motion, with respect to Count Five, Defendant challenges only the "specified unlawful activity" charged in Count One. For the reasons discussed, the evidence supporting the jury's verdict on Count One was sufficient.

that the evidence was sufficient to support his convictions on Counts Six, Seven and Eight, since the "specified unlawful activity" alleged in Counts Six, Seven and Eight was the unlawful prescribing of controlled substances proven in support of Count One, and it was essentially undisputed that the proceeds from the clinic were used to purchase the office building, the Defendants' residence and to fund Dr. Feldman's retirement accounts. Defendant's argument to the contrary is without merit.

Lastly, Defendant argues that the evidence was insufficient to establish that oxycodone, methadone, alprazolam or diazepam dispensed by Defendant were the "but for" or actual cause of deaths of JM, RG, or SW, as alleged in Counts Two, Three and Four. And he argues that the failure to allow him to argue that the decedents' conduct in failing to follow the dosing instructions on the prescriptions was the actual cause of their deaths was "inconsistent with Section 381.026, Florida Statutes (2010), Florida Patient's Bill of Rights and Responsibilities." For the same reasons articulated when Defendant's Rule 29 motion was denied during trial, his renewed motion is denied. And his contention that he was not permitted to argue the conduct of the decedents caused their deaths is without merit.

Dr. Chaitoff reviewed the patient files for JM, SW and RG. He testified that JM had dirty urine screens and there was no documentation of a physical examination, a discussion of JM's aberrant urine screens, the course of treatment being prescribed or the risks associated with the prescribed substances, including methadone, in his patient file. Similarly, SW's file was not documented as to his medical history, aberrant urine screen, the reasons for prescribing controlled substances or the risks associated with those substances, including those associated with high blood pressure. As for RG, Dr. Chaitoff noted that RG was opiate naive when he first saw Defendant, yet received a prescription for a relatively high dosage of a controlled substance after his initial visit.

6

RG's patient file lacked documentation for the reasons for increasing the dosages for the prescribed substances, discontinuing others, or why Defendant added prescriptions for substances RG already had. Dr. Chaitoff testified that these files demonstrated that Defendant was not prescribing for a legitimate medical purpose or in the ordinary course of professional practice. And the evidence supported the allegations that the substances prescribed by Defendant were the cause of the deaths of JM, RG, and SW, as charged in Counts Two, Three and Four.

The patient files and physical evidence showed, with the exception of the amitriptyline found in SW, that Defendant prescribed the very substances alleged in Counts Two, Three and Four shortly before the deaths of JM, RG, and SW.[5] Prescription bottles bearing Defendant's name for the substances detected in the decedents were found in the vicinity of their bodies.

Dr. Wilson testified that SW's death was caused by multi-drug toxicity consisting of oxycodone, diazepam, and amitriptyline, and that the level of oxycodone in SW's system was sufficient in itself to have killed SW. Wilson testified that multi-drug toxicity also caused the death of JM, and that methadone, alprazolam and oxycodone were found in his system. He opined that the methadone alone was sufficient to have caused JM's death. And Dr. Adams testified that methadone was the cause of JM's death. Dr. Thogmartin testified that RG's cause of death was oxycodone toxicity contributed to by diazepam toxicity, and that if it were not for the oxycodone, RG would have survived. And Dr. Adams agreed that RG died of multi-drug toxicity.

The evidence satisfied the "but for" causal standard discussed in *Burrage v. United States*, 134 S.Ct. 881, 891-92 (2014). And Defendant's contention that he was prohibited from arguing that

---

[5] That amitriptyline was not alleged in Count Four is of no moment, considering Dr. Wilson's testimony that the oxycodone alone was sufficient to have caused SW's death.

the decedents' failure to follow the dosage instructions of the prescriptions is without merit. As the Government notes, its motion in limine which addressed to that type of argument (binging and improper ingestion) was denied (*See* Dkts.253, 270).

### Motion for New Trial

Defendant moves alternatively for a new trial, contending that the interests of justice require a new trial under Rule 33(a). The motion is without merit.

With respect to Defendant's contention that the evidence was insufficient, the Rule 29 and Rule 33 standards are not identical. *Butcher v. United States*, 368 F.3d 1290, 1297 n.4 (11th Cir. 2004). Unlike a motion for judgment of acquittal, in ruling on a motion for new trial, the court "may weigh the evidence and consider the credibility of the witnesses." *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985). Where, unlike here, the evidence of guilt is "thin and marked by 'uncertainties and discrepancies,'" "there is room for a district court to reweigh the evidence and re-evaluate the credibility of witnesses." *Id.* (citation omitted). To set aside a jury's verdict, however, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* "[S]uch a case will be rare," however. *Id.*

Consistent with the discussion of the sufficiency of the evidence on Defendant's Rule 29 motion, the evidence did not preponderate heavily against the verdict. Accordingly, Defendant's request for a new trial will be denied. *United States v. Cox*, 995 F.2d 1041, 1044 (11th Cir. 1993). Even under the Rule 33 standard, I find the evidence sufficient to support the jury's verdict. And I find that Defendant's substantial rights were not jeopardized by errors at trial and that no miscarriage of justice has occurred.

First, contrary to Defendant's contention, the evidence which touched upon Florida's

"prescription drug abuse problem and the number of prescription drug overdose deaths" was not a feature of the trial, consistent with this Court's admonition to the Government that there would be no undue focus on the so-called prescription drug abuse epidemic.[6] The evidence that was admitted simply provided an explanation of why law enforcement targeted pain clinics in general and this Defendant in particular. As the case agent explained, Pill Nation was a nationwide DEA investigation of pain clinics and the Feldman investigation was a spin off of the Miami "epicenter" of pain management and the prescribing of controlled substances for no legitimate medical necessity.

As the Government correctly urges, that evidence was "inextricably intertwined" with the evidence establishing Defendant's guilt. It provided factual context for the investigation of Defendant and his pain clinic and was necessary to explain why law enforcement sent undercover agents into his medical practice. *United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998) ("Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury."), *quoting United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir.1985).

Evidence describing the rising epidemic of prescription drug abuse and the manner by which the abusers acquired prescription narcotics (doctor shopping, prescribing of excessive dosages of controlled substances by physicians at pain clinics in Florida) was certainly relevant to put this case in its proper perspective. And it was properly admitted under Rule 403. Its probative value was not

---

[6] That admonition was the result of argument on Defendant's Motion in Limine addressed to references to Pill Nation I and II, the name of the investigation resulting in Defendant's arrest (Dkt. 218). As the Government correctly recalls, evidence from law enforcement describing what constituted a "pill mill" was deemed inadmissible.

substantially outweighed by the danger of unfair prejudice.

Defendant points to no particular prejudice he suffered as a result of the explanation of law enforcement's investigation of pain clinics and medical professionals who were allegedly prescribing controlled substances not for legitimate purposes and not in the usual course of professional practice. And finally, references during the trial to the number of prescription drug abuse deaths came from Defendant's own statements to undercover agent Pittaluga. That evidence was relevant to whether Defendant knowingly prescribed controlled substances not for legitimate purposes and not in the usual course of professional practice. No miscarriage of justice occurred.

Defendant's contention that Dr. Chaitoff's expert opinions were "impermissible *ipse dixit* under *Daubert*" are without merit. Before trial, Defendant's *Daubert* challenge of Dr. Chaitoff's opinions and methodology was considered and rejected after a lengthy evidentiary hearing (Dkts. 98, 109, 115). And during his testimony, he explained that his opinions of whether Defendant's prescribing of controlled substances was not for legitimate purposes and not in the usual course of professional practice were based on federal and state standards of care, relevant Florida statutes, various guidelines and regulations, including those of the Florida Department of Health, as well as his own training, education and experience in pain management. He certainly did not rely exclusively on his own experiences, although at times he defended his opinions when cross examined by relying on his own professional experience. Testimony of this nature is admissible. *See United States v. Azmat*, 805 F.3d 1018, 1042-43 (11th Cir. 2015).

In sum, Dr. Chaitoff based his opinions on a review of 48 of Defendant's patient files and identified, as the Government correctly describes, "a consistent pattern of Dr. Feldman prescribing controlled substances in excessive quantities not for a legitimate medical purpose and not in the

usual course of professional practice." The Government correctly notes that he explained the importance of urine screens in discovering diversion and abuse of medications, and identified patients of Defendant who had dirty urine screens, and who either had illegal drugs in their system or should not have had prescribed medications in their system because they had not been recently prescribed those substances, based on their pharmacy profile. And the Government is likewise correct that he pointed out inadequate patient records, including inadequate patient histories, inadequate documentation of physical examinations, the absence of explanation for increasing dosages or changing prescribed substances, and a lack of patient monitoring for those who exhibited signs of potential abuse. And Chaitoff found instances of Defendant prescribing excessive quantities of controlled substances or combinations of controlled substance which exposed patients to risks, but without documenting that the patients had been informed of the risks. Several of Defendant's patients testified and substantiated several of Dr. Chaitoff's findings.

To the extent Defendant contends that Dr, Chaitoff was partisan, he was subjected to extensive cross examination regarding how he became involved in the Feldman investigation, his reasons for doing so, and how the files he was asked to review were selected and by whom. These considerations went to the weight of Dr. Chaitoff's testimony, not its admissibility.

Finally, Defendant's argument that the interests of justice require a new trial because Teresa Mayes' testimony that her son's (JM) death was the result of Defendant's prescribing a combination of methadone and Xanax was inadmissible hearsay is without merit. That is not what Mayes testified to. Mayes testified that she observed her son take methadone and Xanax the day before he died, and that she had looked at the prescription bottles and saw Defendant's name on them. As she spontaneously testified that the combination of methadone and Xanax was "deadly," Defendants

objected and moved to strike. The objections were sustained, Mayes' testimony was stricken, and the jury was instructed to disregard it.

## Conclusion

For these reasons, Defendant Edward Neil Feldman's Renewed Motion for Judgment of Acquittal or, in the Alternative, Motion for New Trial (Dkt. 295) is DENIED.

**DONE AND ORDERED** this _19ᵗʰ_ day of May, 2016.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record